DONALD L. SCHUERHOLZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schuerholz v. Commissioner
Docket No. 8155-74.
United States Tax Court
T.C. Memo 1976-163; 1976 Tax Ct. Memo LEXIS 242; 35 T.C.M. (CCH) 726; T.C.M. (RIA) 760163; May 24, 1976, Filed; as amended June 18, 1976. Donald L. Schuerholz, pro se. Fred G. Gerald, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioner's 1967 income tax in the amount of $4,321.35. There are two issues before us. The first is whether petitioner is entitled to deduct his wholly worthless investment in a nightclub as an ordinary loss under section 165(c)(1). [1] The second issue is whether petitioner *244 can deduct, under section 162, $594 in expenses from promoting and managing two dances in December 1970. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner Donald L. Schuerholz (Schuerholz) resided at Lutherville, Maryland, at the time the petition was filed. He filed his 1970 income tax return on a calendar-year basis with the District Director of Internal Revenue, Baltimore, Maryland. In November 1966, Schuerholz and William A. Sullivan (Sullivan) began the operation of a social club that held weekly Wednesday night dances for young adults called "The Forum." The dances were held on the second floor at an establishment called "The Club Venus" (Club Venus). Membership cards were sold and required for admission; liquor was sold; monthly publications were mailed to members, and trips and outings were planned for members. On March 28, 1967, Schuerholz, Sullivan, and two others formed a corporation under the laws of Maryland named "The Forum Incorporated" (Forum, Inc.). The corporation had an authorized capital of 1,000 shares, no par *245 value common stock, but the stock was never issued. Forum, Inc. never had an annual meeting or an election of directors, but the incorporators, including Schuerholz and Sullivan, were named by the corporate charter as directors. Forum, Inc. was formed to operate the weekly dance and social club. By incorporating Forum, Inc., Schuerholz and Sullivan sought to avoid personal liability. Schuerholz was president of Forum, Inc., and Sullivan was its secretary. Forum, Inc. had its own checking account and Sullivan acted as bookkeeper. On May 1, 1967, Forum, Inc. entered into an agreement with the owners of Club Venus for use of the second floor for the weekly dances. The agreement provided for Forum, Inc.'s rental of the second floor of Club Venus (approximately 6,000 square feet) on Wednesday nights for a certain amount plus half of the net profits from the dances, except that all net profits exceeding $1,000 belonged to Club Venus. The agreement was for one year, with an option to renew for an additional two years, which Forum, Inc. exercised. In 1968, petitioner received $6,050 in salary from Forum, Inc., which he reported on his Federal income tax return as income "as a partner *246 in the operation of an entertainment club known as 'The Forum Inc.'" Petitioner reported income in 1967 and 1969 in a like manner. By January or February 1969, attendance at the Wednesday night dances had fallen and profits had gotten very slim. Sullivan proposed a complete renovation of the business and premises to provide for a full-time nightclub operation. Petitioner and Sullivan calculated that they needed $30,000 to make the necessary improvements which included changes in the decor, installation of a bar and stools, sound system, bandstand, carpeting, lighting, and the purchase of tables and chairs. Petitioner and Sullivan entered into negotiations with the owners of Club Venus for a long-term lease of the second floor for nightly use and for use of a downstairs' kitchen for food and banquet catering. No lease agreement was ever reduced to writing, apparently because of the illegality of subletting Club Venus' liquor license. However, Club Venus, petitioner, and Sullivan orally agreed that petitioner and Sullivan would use the second floor nightly for an extended period of time at $2,300 per month if petitioner and Sullivan paid for the contemplated renovations. This *247 oral understanding in the nature of a "gentleman's agreement" was intended to replace the written agreement between Forum, Inc. and Club Venus commencing in March 1969. Petitioner and Sullivan considered the nightclub a new business and discussed incorporating it as the "Mark Corporation" (Mark Corp.). Ownership was to be divided as follows: 51 percent to Sullivan who was to contribute $10,000 to capital, 40 percent to petitioner in exchange for a $15,000 contribution to capital, and 9 percent to a third individual who was to contribute $9,000 to capital. The actual amounts contributed by Sullivan, petitioner and the third individual toward the capital of the nightclub were, respectively, $6,745, $12,600, and $5,000. During the period May 1, 1969 through May 27, 1969, Schuerholz drafted four checks payable to Sullivan totaling $9,000 and bearing notations that the checks were in payment for "'Mark' Corporation Stock." All of these checks were endorsed by Sullivan and paid. On June 16, 1969, a check certified by the First National Bank of Maryland in the amount of $3,500 was purchased by Schuerholz and made payable to "The Upstairs." On July 3, 1969, petitioner wrote a personal *248 check payable to "The Upstairs" in the amount of $100. No endorsement appears on either of these two checks, but both of them were paid. Renovation of the second floor of Club Venus was begun in March or April 1969. A checking account was opened in the name of "The Upstairs," and the renovation was largely paid for out of this account or out of Sullivan's personal checking account. One invoice for flooring renovation in the amount of $1,859.50 was addressed to Sullivan with billing to Forum, Inc. The flooring work done was not wholly satisfactory to Sullivan and a portion of the bill was not paid. Subsequent litigation involved Sullivan in his personal capacity. In April 1969, Sullivan drafted a personal check payable to "Forum, Inc." in the amount of $400. At least one check was drafted on Forum, Inc.'s checking account during April. Mark Corp. was never formed though some of the invoices for improvements made during the renovation were addressed to it at the Club Venus. The total cost of renovation was approximately $21,500. The only removables bought for the renovation were tables and chairs. In May 1969, petitioner and Sullivan opened their nightclub for business, *249 trading as "The Upstairs." Wednesday nights were called "Forum Night." Petitioner worked approximately 50 hours a week as comanager with Sullivan of The Upstairs. The new operation was occasionally represented to vendors as Forum, Inc. On October 30, 1969, the State of Maryland annulled the corporate charter of Forum, Inc. for failure to pay Maryland State franchise taxes. Petitioner and Sullivan continued to operate the nightclub until December 1969. The Upstairs was never as profitable as petitioner had expected, and by the end of 1969, The Upstairs owed Club Venus $9,000 in rental arrearage and other liabilities. In January 1970, an agreement was reached between The Upstairs and Club Venus that in consideration of forgiveness of the $9,000 debt and termination of their "gentleman's agreement," The Upstairs would relinquish to Club Venus all rights in the improvements and equipment used in the nightclub operations. Subsequently, petitioner and Sullivan vacated the second floor of Club Venus. On his 1970 Federal income tax return, petitioner claimed a net loss from the operation of The Upstairs as a partnership with Sullivan. He also claimed a net loss of $594 from the *250 operation of a sole proprietorship known as "The Forum." Petitioner's claimed loss from the sole proprietorship arose from his operation of two dances held on December 10 and 17, 1970, at a banquet room in an establishment known as "Northpoint Gardens." Petitioner used the name "The Forum" to advertise the dances because he felt the name would be publicly recognized. In connection with promoting and conducting the dances, petitioner incurred expenses in the amounts of $430 for two bands, $41.60 for posters, and $72 for radio advertising. The dances were failures. On his 1970 Federal income tax return, petitioner reported a loss in the amount of $14,980.95 as adjusted gross income. Petitioner had filed a 1967 Federal income tax return reporting a total income tax liability for 1967 in the amount of $4,583.71. On April 15, 1970, petitioner filed an Application for Tentative Refund From Carryback of Net Operating Loss or Unused Investment Credit (Form 1045) proposing to carryback $14,884.31 of his claimed 1970 net operating loss to 1967, resulting in a decrease in his 1967 income tax in the amount of $4,321.35. Respondent allowed petitioner's claim and remitted a check for the *251 refund that included applicable interest to petitioner. OPINION Issue 1. Whether Petitioner May Deduct, to the Extent of His Ownership Interest, a Proportion of the Loss Existing at the Termination of The Upstairs' Business As An Ordinary Loss in 1970 under Section 165(c)(1)
Respondent's position is that The Upstairs was an expansion and continuation of the business of Forum, Inc., and that the loss existing at the termination of the nightclub's business in 1970 belongs in the first instance to Forum, Inc. He argues that petitioner's loss is limited to the amount of his investment in Forum, Inc., which became wholly worthless in 1970 and that his loss is a capital loss under section 165(g). Petitioner maintains that The Upstairs was a new business organized as a partnership consisting of himself, Sullivan, and a third individual. He insists that Forum, Inc. was wholly dormant during the operation of The Upstairs and should be disregarded in determining the amount and character of the loss existing at the termination of the nightclub's business. He concludes that he is entitled to deduct a proportionate share of that loss as an ordinary loss in the amount of $13,500. *252 First, petitioner would have us ignore Forum, Inc. entirely, as he apparently did even when the business was operated as "The Forum Incorporated." He points to the absence of any annual meetings, failure to issue stock and lack of election of directors to support his position. None of these facts are fatal to the corporation's existence for tax purposes. Fleming G. Railey,36 B.T.A. 543 (1937). The salient fact is that Forum, Inc. was validly incorporated under Maryland law on March 28, 1967, and it engaged in substantial business activity. Schuerholz and Sullivan chose to incorporate their weekly dance and social club in order to avoid personal liability. Having chosen that course, petitioner cannot now disavow it. William B. Strong, 66 T.C. (April 5, 1976). The fact that petitioner reported income from Forum, Inc. as a "partner in the operation" in 1967, 1968, and 1969, indicates to us only his own disrespect for the separate corporate entity of the business. The record is clear that petitioner and Sullivan actively traded as "The Forum Incorporated" at least until March 1969. Forum, Inc. had its own active checking account, contracted in its *253 own name and otherwise held itself out to the public as a corporate business. We cannot ignore its corporate existence. Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). Petitioner urges that we consider Forum, Inc. to be disbanded in March 1969, when renovation of the second floor of Club Venus was begun. Although the social club and weekly "Forum" dances were operated as "The Forum Incorporated," petitioner suggests that the nightclub, operated as "The Upstairs," was a new and different business. Additionally, petitioner points to the closing out of Forum, Inc.'s checking account, the substitution of the oral lease agreement for the written lease and profit-sharing agreement with Club Venus, and to the separate checking account for The Upstairs to substantiate his argument that The Upstairs was not Forum, Inc. Although petitioner testified that Forum, Inc. ceased to operate in March 1969, Sullivan testified that Forum, Inc. operated during the renovation period. Confusion over the form of business operation is not limited to the timing of when Forum, Inc. purportedly ceased business and The Upstairs began. Flooring renovations were billed to *254 Forum, Inc., and its checking account was still active in April 1969. Invoices for work done and improvements made during renovation were not only sent to Forum, Inc., but also to Mark Corp., which never existed. On occasion The Upstairs was represented to vendors as Forum, Inc. We can appreciate that a full-time nightly nightclub operation is significantly more involved than a social club and weekly dance for young singles. However, petitioner has failed to demonstrate that the business was organized any differently after he and Sullivan were trading under the name of The Upstairs than when they traded as Forum, Inc. [2]
Petitioner and Sullivan had considered incorporating The Upstairs as Mark Corp. Sullivan testified that the reasons for incorporating the nightclub business were more compelling than the reasons for incorporating the weekly "Forum" dance and social club business, yet Mark Corp. was never formed. We think Mark Corp. was not formed because it would have been superfluous. Forum, Inc. still existed to insulate petitioner from personal liability; it was never voluntarily dissolved. Md. Ann. Code *255 art. 23, sec. 76 (1957). Petitioner's payments, used to renovate the second floor of Club Venus, were made indifferently either, to Sullivan who deposited them in his personal checking account or to The Upstairs. Petitioner's payments totaled $12,600 and were intended by petitioner to be his contribution to the capital of the nightclub business. In exchange for his payments he was to receive a 40-percent ownership interest in Mark Corp. Each of the payments were made by check, most of them bearing the notation that they were in partial payment for Mark Corp. stock. Petitioner's contributions to the capital of the nightclub business were contributions to Forum, Inc.'s capital. [3] Cf. Edward G. Janeway,2 T.C. 197 (1943); Phil Kalech,23 T.C. 672 (1955). *256 Although there was never any stock issued by Forum, Inc., we think petitioner had "a right * * * to receive a share of stock" within the meaning of section 165(g)(2) from Forum, Inc. in exchange for his investment. John P. Gawler,60 T.C. 647 (1973), affd. per curiam, 504 F. 2d 425 (4th Cir. 1974). In Gawler the taxpayers' right to receive stock was conditioned on the successful performance of the business. We held that such a condition was not fatal to the characterization of their potential receipt of stock as a "security" within the meaning of section 165(g)(2). In the instant case petitioner's right to receive Forum, Inc.'s stock was conditioned only on the stock's issuance. As an incorporator and director of Forum, Inc., so named by the corporate charter, petitioner was in a position to effect the issuance of the stock. He and Sullivan just never got around to calling an initial directors' meeting so that the authorized stock could be issued. We think the condition on petitioner's right to receive Forum, Inc.'s stock was much less substantial and restrictive than the condition in Gawler and that, well within the holding of Gawler, *257 we can say petitioner had a "security," the basis of which was his proven total capital contribution in the amount of $12,600. Petitioner has wholly failed to prove that for tax purposes The Upstairs was not a continuation of the corporate entity Forum, Inc. He has attempted to show it was not such a continuation by proving his total disregard for Forum, Inc. as an entity separate from himself and Sullivan. However, Forum, Inc. was formed to carry out substantive business functions which indeed it did, and we cannot disregard it. Perry R. Bass,50 T.C. 595 (1968). Forum, Inc. existed until October 30, 1969, when the State of Maryland annulled the corporate charter for failure to pay state franchise taxes. For tax purposes, the annulment of Forum, Inc.'s charter does not necessarily have the effect of discontinuing the corporate entity. Roe Stephens Mfg. Co.,12 B.T.A. 1254 (1928); John Crocker,32 B.T.A. 861 (1935). We hold that The Upstairs was an association taxable as a corporation after the annulment of Forum, Inc.'s charter. The Upstairs continued to function until December 1969, exactly as it had prior to the annulment *258 of Forum, Inc.'s charter. Petitioner and Sullivan continued as associates in the nightclub business, and thus, cases such as Knoxville Truck Sales & Service, Inc.,10 T.C. 616 (1948), and Coast Carton Co.,10 T.C. 894 (1948), are inapposite. It appears to us that The Upstairs' business prospects were so poor when Forum, Inc.'s charter was annulled that petitioner and Sullivan were then expecting to terminate business. They in fact did so two months later in December 1969. Petitioner's right to receive stock in Forum, Inc. was not worthless at the time its charter was annulled. Forum, Inc.'s charter could have been revived "at any time" by the payment of its delinquent franchise taxes at the request of petitioner who was president of Forum, Inc. Md. Ann. Code art. 23, sec. 85 (1957). Petitioner's investment in Forum, Inc. became wholly worthless in January 1970, when the premises of Club Venus were vacated by agreement. Therefore, we find for respondent and hold that petitioner is entitled to deduct a capital loss in 1970 in the amount of $12,600. Issue 2. Whether Petitioner Incurred $594 in Losses from Promoting and Managing Two Dances *259 in December 1970
We do not doubt that the two dances held at Northpoint Gardens in December 1970, that were promoted and managed by petitioner, were transactions entered into for profit within the meaning of section 165(c)(2). Petitioner has proved that he incurred $543.60 in expenses in promoting and managing the dances. However, petitioner has not shown what the gross receipts were from those dances. Consequently, we cannot allow him his claimed deduction under section 162 for $594 as expenses incurred in connection with the dances. Nevertheless, we were convinced by petitioner and one of his witnesses that the dances were dismal failures and that the gross receipts were not enough to cover the $430 cost of the bands at the two affairs. We think that this is an appropriate case to apply Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), because petitioner has shown that he incurred some loss. In our best judgment, we think petitioner received $400 in gross receipts and that he is entitled to deduct a loss from the dances in the amount of $143.60 under section 165(c)(2). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. M. H. McDonnell,T.C. Memo. 1965-125↩.
3. If the nightclub were a partnership, the amount of the payments would be petitioner's basis in his partnership interest. Sec. 722. Upon termination of the partnership and liquidation of petitioner's interest, petitioner's loss would be a capital loss. Sec. 731(a). Thus, even if we were to agree with Schuerholz that the nightclub were a partnership, respondent would prevail on this issue.↩